O'CONNOR *v.* SCALLEN.

UNION TRUST CO. *v.* O'CONNOR.

JOINT ADVENTURES—EVIDENCE—SUFFICIENCY.

Where plaintiff real estate employee had obtained an option on 30 acres of land in his own name, and, being unable to finance same, sold a one-half interest to his employer, who negotiated a sale thereof to a real estate company and was by it appointed a sales manager, plaintiff's claim against his former employer that he was to receive a share of the profits realized as commissions on sales, *held,* not sustained by a preponderance of the evidence.

Appeal from Wayne; Dingeman (Harry J.), J. Submitted October 21, 1919. (Docket No. 87.) Decided December 23, 1919.

Bill by A. Louis O'Connor against John P. Scallen, executor of the last will of John A. O'Brien, deceased,

208—Mich.—27.

and others for an accounting. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Oxtoby & Wilkinson* and *McKee Robinson,* for plaintiff.

*McNamara & Scallen* and *Fred Dye,* for defendant estate.

FELLOWS, J. By a stipulation filed in this court since the record was printed and filed, we are advised that the matters involved in the various appeals other than the one having reference to the disposition to be made of the controversy between the plaintiff, Mr. O'Connor, and the O'Brien estate have been adjusted and need not be considered by this court. Only such facts, therefore, need be stated as bear upon this branch of the case, and our discussion and consideration of this controversy alone will dispose of the case. Mr. O'Brien died after decree in the court below and the suit was revived in the name of the executor of his estate.

In April, 1915, and for some two or three years prior thereto the plaintiff, Mr. O'Connor, was in the employ of John A. O'Brien, a real estate dealer of the city of Detroit, who specialized in acting as general agent of subdivision properties. In that month plaintiff obtained from one Wandke and wife in his own name and by payment of $200 of his own money an option to purchase 30 acres of land located near Detroit and available for platting purposes. The purchase price was $30,000; $9,800 was to be paid by October 1, 1915, and the balance in deferred payments. It is the claim of the plaintiff that he had decided to quit Mr. O'Brien's employ; that he obtained this option and had an opportunity to become associated with another dealer, also having an option on unplatted property; that he informed Mr. O'Brien of his inten-

tion to leave and of his option, and as a result of some talk, it was agreed between them that Mr. O'Brien should pay him one-half the amount he had invested in the option; that the option should be disposed of to a real estate company in which Mr. O'Brien was interested or to a new company to be organized; that they should each raise their proportionate share of the money to make the first payment; that each was to receive one-half of what it was sold for; that a sales contract should be procured from the company taking the option with Mr. O'Brien to put the property on the market; that the commission on the sales, after paying expenses, was to be divided, one-third to Mr. O'Connor and two-thirds to Mr. O'Brien; he insists that these agreements of Mr. O'Brien were a part of the consideration for the transfer of the option; that he has fulfilled all of the obligations he was to perform and is entitled to an accounting. Mr. O'Brien denied that any such arrangement was made. He testified that Mr. O'Connor and he had talked about Mr. O'Connor getting the option before it was secured; that when Mr. O'Connor had obtained it he was without means or financial connections sufficient to make the payment of $10,000, and could not float the enterprise; that Mr. O'Connor never intimated that he was going to leave his employ and handle the option himself, but did ask him to come in on it, and that he made an outright purchase of a one-half interest in the option for $100 and he exhibits a receipt signed by Mr. O'Connor for this amount reciting that it is "payment in full for one-half interest (undivided) on option held by me on Wandke piece of 30 acres, Hamtramck." He also exhibits the check given for the payment. It should be stated that the receipt and the check are the only written evidence of the dealings of the parties.

Mr. O'Brien was largely interested in, and the presi-

dent of, the defendant O'Brien-Dores Development Company. Mr. O'Connor had a small amount of stock in the company and was its secretary. This company had been the owner of, and had put several subdivisions on the market. In each instance, Mr. O'Brien had acted as its sales agent in disposing of the lots. The option on the Wandke property was sold to the O'Brien-Dores Development Company for $15,000 of its stock. The directors' meeting at which the option was purchased was held June 8th. The option had been assigned to one Lawton, a friend of Mr. O'Connor, and the same was purchased by the company from him and the stock issued to him. He, in turn, surrendered his certificate and $7,500 of the stock was issued to O'Connor and a like amount to O'Brien. At the same meeting a sales contract was authorized with O'Brien. Both O'Connor and O'Brien voted to purchase the option from Lawton, but O'Brien did not vote on the question of the sales contract. On August 9th the board of directors of the company authorized the borrowing of $10,000 to make the first payment on the Wandke property and the payment of a bonus if necessary to secure the loan. Both parties seem to have voted for this action. The property was put on the market as the Fordham subdivision. Mr. O'Brien employed a Mr. Harrison as sales manager to handle the subdivision. The lots were all sold. Shortly thereafter, and in March, 1916, both Mr. O'Connor and Mr. Harrison left the employ of Mr. O'Brien and formed a partnership. February 2, 1917, this bill was filed. From a decree dismissing it on the merits after a hearing this appeal was taken.

We agree with the result reached by the trial judge and will proceed to state some of the reasons which impel us to this conclusion. What the agreement was between the parties was known only to these two men. As to what it was we have the testimony of the one

against the testimony of the other. Defendant insists that there was nothing beyond the purchase of a half interest in the option; that the payment of $100 was all the consideration agreed upon. Plaintiff insists that there were further considerations. The receipt, executed nearly two years before this case was started, recites that the hundred dollars was "payment in full for one-half interest" in the Wandke option. While a receipt may not be conclusive upon the parties as a matter of law, in the instant case it is quite persuasive of defendant's claim. Beyond this is the situation of the parties. Plaintiff had an option to purchase this property, for which he had paid $200, but he was required to pay the balance of the down payment of $10,-000 ($9,800) in a few months; unless that payment was made the option would expire and be valueless. He was not in position to make the payment; defendant through his connections was. The stock of the O'Brien-Dores Development Company was then worth par and was at the time of the trial worth much more. Mr. O'Brien's check to plaintiff for the hundred dollars, which he claims was the full consideration for the half interest in the option, is dated June 5th. Three days later, plaintiff and Mr. O'Brien received stock of the value of $15,000 for the option, $7,500 of which went to Mr. O'Connor. It seems to us quite doubtful that this employee, with the immediate prospect of $7,500 for his hundred-dollar investment, haggled with his employer for a greater profit.

Mr. O'Brien was the president of the O'Brien-Dores Development Company, and the holder of a substantial amount of its stock. He had been sales agent for all the subdivisions the company had put on the market. There is nothing in the record intimating that the company was dissatisfied with his past services. When the matter of selecting a sales agent came up at the directors' meeting he left the room. Plaintiff

claims that Mr. O'Brien left the matter of making this arrangement in his hands. Mr. O'Brien denies this. It should be stated at this point that we have been particularly struck, in reading plaintiff's testimony, with the marked magnifying of the effect of his efforts and the marked minimizing of the effect of the efforts of others in making a success of each detail in working out this transaction. It is plaintiff's claim that at this directors' meeting he succeeded in overcoming objections of other directors and succeeded in securing a sales contract that was more advantageous to Mr. O'Brien than to the company, and he urges that this is evidence that he had a personal interest in the sales contract with Mr. O'Brien, and that his action, while sitting on the board of directors of this corporation, was to further that personal interest. What we may think of this claim viewed in the light of public policy is unimportant, but it gives us a sidelight on plaintiff's mental processes and his moral viewpoint that has been quite helpful in reaching a conclusion in this case as to where the truth rests.

It is alleged in the bill that a part of the arrangement between plaintiff and Mr. O'Brien was that they were each to raise one-half of the funds necessary to finance the transaction and that plaintiff, to carry out his part of the bargain, sold sufficient stock to cover his half but that O'Brien took the proceeds of such sales and used his own stock instead of treasury stock in filling the sales. The answer denies this arrangement. Mr. O'Brien says he sold some of his stock, that the sales were made by one Holz to whom he paid a commission. It is claimed by plaintiff that he raised his half of the necessary funds by these sales of stock, but that by reason of O'Brien's substituting his stock for company stock, and O'Brien's failure to sell enough stock to make up his share the company was obliged to borrow money and pay a large bonus. But the rec-

ord discloses that the arrangement for borrowing the money and paying the bonus was made at a meeting of the board of directors at which plaintiff was present on August 9th, while all of the stock that was sold except seven shares was sold after that date and some of it months afterwards, and plaintiff admitted in his testimony that most of the sales were made by Mr. Holz, although he claims to have assisted. Nor was there introduced in evidence the record of any meeting of the directors of the company authorizing the issuance of any treasury stock except that issued for the option.

We are not persuaded that Mr. O'Brien's affidavit filed in other litigation, when properly analyzed, stamps him, as plaintiff claims, as a man unworthy of belief. His testimony in the instant case was taken by deposition shortly before he left for France where he met his death. A reading of his testimony shows a straightforwardness in his answers and convinces one of his truthfulness.

We cannot without making this opinion unnecessarily prolix point out further circumstances detailed in the record which, together with those here detailed, convince us that the plaintiff has failed to establish the claim he now asserts by a preponderance of the proof. We have read this record with care. From it we conclude that plaintiff has not sustained the burden cast upon him by the law to establish his case by evidence and circumstances which outweigh the evidence and circumstances against it. In this conclusion, we are fortified by the fact that the trial judge, who heard the testimony and who saw the plaintiff upon the stand, reached the same conclusion.

The decree of the court below will be affirmed. with costs to the appellee.

BIRD, C. J., and SHARPE, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.